UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
AT KNOXVILLE

| | | |
|---|---|---|
| PARTYLITE GIFTS, INC., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No.: 3:06-CV-170 |
| | ) | (VARLAN/SHIRLEY) |
| SWISS COLONY OCCASIONS, a/k/a | ) | |
| ACCESS VENTURES, INC., SWISS | ) | |
| COLONY, INC., AND KATHY WATKINS, | ) | |
| | ) | |
| Defendants. | ) | |

## MEMORANDUM OPINION

Kathy Watkins was formerly employed by PartyLite Gifts, Inc., as a Director of Sales Development, before she joined Swiss Colony Occasions ("SCO") as the Senior Vice President of Sales. After joining SCO, Ms. Watkins began recruiting salespeople from PartyLite Gifts. Plaintiff PartyLite contends that defendant Watkins and her employer, defendant SCO, are "raiding" plaintiff's salesforce by making use of trade secrets defendant Watkins misappropriated from plaintiff. Plaintiff alleges that defendants' recruitment based upon the misappropriated trade secrets constitutes tortious interference and inducement to breach of contract, breach of contract and fiduciary duty, and unfair competition.

This civil action is now before the Court for consideration of plaintiff's motion for preliminary injunction [Doc. 8]. Plaintiff seeks a preliminary injunction pursuant to Fed. R. Civ. P. 65 to prohibit defendants "and anyone working with or for them from recruiting, attempting to recruit or assisting in the recruiting [sic] of PartyLite salespeople, or entering

into any further agreements with PartyLite salespeople[,] including Bridge Agreements, or interfering with PartyLite's valuable relationships." Doc. 9 at 8. Defendants respond in opposition to the motion, arguing that plaintiff has not demonstrated a likelihood of success on the merits as to its trade secrets claim, and plaintiff's other claims are all derivative of that claim. *Id*. at 8-9, 17.

On July 10, 2006, the Court heard oral argument on the motion. *See* Doc. 38. The Court has also reviewed the various briefs, affidavits, and declarations. *See* Docs. 8, 9, 24, 25, 26, 27, 29, 33, 34, 35, 36, 37-2. For the reasons discussed herein, the Court will deny plaintiff's motion for preliminary injunction.

**I.     Relevant Facts**

PartyLite is a direct sales firm that sells candles and other similar items. SCO is a direct sales firm that sells food and other similar items. Both firms utilize the home party plan sales method whereby individuals sell products to their family, friends, and acquaintances during in-home events or other small gatherings. An important feature of direct sales firms utilizing the home party plan sales method is the development of a sophisticated salesforce organizational structure. PartyLite has structured its salesforce into a multi-level organization composed of salespeople who are independent contractors. Based on the accomplishment of certain sales and recruiting goals, an individual salesperson may rise through the ranks. As a salesperson rises through the organization, they begin to earn commissions not only from their own sales but also from the sales of those they have

recruited into the firm. Over time, as this process continues, a salesperson can reach the level of a Senior Regional Vice President, with salespeople beneath them in the organization.

Higher-level PartyLite salespeople enter into a contract with PartyLite whereby they agree to provide support to their "downline" salespeople and abide by the code of conduct. Among the provisions of the code of conduct is a requirement that a salesperson not disclose "confidential information," including the names and contact information of downline salespeople and customers, sales and ordering information, and any other information that would be helpful to others competing with PartyLite. PartyLite also attempts to protect its confidential information through the use of "CONFIDENTIAL" stamps and firewalls. On the other hand, PartyLite also distributes literature containing the names and locations of its salespeople, including "Reflections" magazine and its public website. Furthermore, PartyLite also permits its salespeople to use PartyLite literature and business cards, further publicizing themselves in an attempt to solicit new customers.

Defendant Watkins was employed by PartyLite to develop its extensive salesforce. As an employee, defendant Watkins was required to abide by the code of conduct, including the confidentiality provisions, but she did not enter into non-solicitation or non-competition agreements in the event of her discharge or resignation. On March 6, 2006, defendant Watkins resigned from PartyLite and joined SCO as the Senior Vice President of Sales.

PartyLite alleges that defendant Watkins and SCO undertook a strategy to raid PartyLite's salesforce using trade secrets defendant Watkins misappropriated from PartyLite during her fifteen years of employment. PartyLite recounts how SCO began offering various

3

gift baskets to certain PartyLite salespeople, depending on their sales ranking, and offers the declaration of Llounda Putz, who believed the gifts were a ruse to establish a means to begin recruiting the recipient. PartyLite also recounts how defendant Watkins, while still employed with PartyLite, began giving PartyLite salespeople her new email address and, when asked, would discuss SCO. Finally, PartyLite points to a special agreement, known as a "Bridge Agreement," that SCO utilizes to attract experienced salespeople.

As PartyLite explains it, under the provisions of the Bridge Agreement, an experienced salesperson joins SCO with a bridge title equivalent to a salesperson's ranking with PartyLite and receives special payments for a certain transition period. Along with these benefits, however, the new SCO salesperson has a certain period of time to recruit other salespeople to join SCO and fill in the lower levels of the organization. If successful, the salesperson keeps the bridge title; but if unsuccessful, the salesperson is demoted to a lower level within SCO. Based on these incentives, PartyLite argues that the Bridge Agreement is designed to encourage the recruitment of entire groups or clusters of PartyLite's salesforce structure.

PartyLite contends that defendant Watkins's misappropriation of trade secrets and SCO's use of the Bridge Agreement has resulted in the recruitment of 15, but as many as 100, PartyLite salespeople. PartyLite speculates that if the downline organizations of those 15 salespeople are lost, the damage to PartyLite could be $15 million per year, but it argues it is difficult to calculate the loss. Furthermore, because of the commission structure, the loss

4

of some salespeople also affects the incomes of other salespeople. In light of it's alleged irreparable harm, PartyLite has filed the instant motion seeking a preliminary injunction.

## II. Discussion

The Court must weigh four factors in determining whether to issue a preliminary injunction: "(1) the likelihood of the plaintiff's success on the merits; (2) whether the injunction will save the plaintiff from irreparable injury; (3) whether the injunction would harm others; and (4) whether the public interest would be served." *Performance Unlimited, Inc. v. Questar Publishers, Inc.*, 52 F.3d 1373, 1381 (6th Cir. 1995) (citations omitted). These factors must be balanced against one another and should not be considered prerequisites. *Performance Unlimited*, 52 F.3d at 1381 (citing *In re DeLorean*, 755 F.2d 1223, 1229 (6th Cir. 1989)). On the other hand, a preliminary injunction is an extraordinary remedy that should only be granted when the movant carries its burden of persuasion. *Leary v. Daeschner*, 228 F.3d 729, 739 (6th Cir. 2000). *See also Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997) (preliminary injunction is "an extraordinary and drastic remedy"). With those principles in mind, the Court now turns to a balancing of the four factors.

### A. Likelihood of Success on the Merits

The showing necessary to establish a likelihood of success on the merits varies inversely with the other three factors. *See DeLorean*, 755 F.2d at 1229. Accordingly, where the other three factors strongly favor issuance of an injunction, the movant may make a lesser showing of a likelihood of success on the merits. *See Performance Unlimited*, 52 F.3d at 1386. But where the movant makes a stronger showing of a likelihood of success on the

5

merits, a lesser showing of the other three factors is necessary. *See Total Car Franchising Corp. v. L & S Paint Works, Inc.*, 981 F. Supp. 1079, 1081 (M.D. Tenn. 1997) (stating that showing of "substantial likelihood" is sufficient to show "the three other factors will favor the party as well"). At a minimum, however, to establish the likelihood of success on the merits, "it is ordinarily sufficient if the plaintiff has raised questions going to the merits [which are] so serious, substantial, difficult, and doubtful as to make them a fair ground for litigation and thus for more deliberate investigation." *University of Texas v. Camenisch*, 451 U.S. 390, 395 (1981), *quoted in Corporate Express Office Prod., Inc. v. Warren*, No. 01-2521 DBRE, 2002 WL 1901902 at *7 (W.D. Tenn. 2002).

      i.    *Misappropriation of Trade Secrets*

Under the Tennessee Uniform Trade Secrets Act ("TUTSA"), the elements for a misappropriation of trade secrets claim are: (1) the existence of a trade secret; (2) misappropriation of the trade secret by the defendant; and (3) resulting detriment to the plaintiff. *See* Tenn. Code Ann. §§ 47-25-1701 to 1709 (2005); *Stratienko v. Cordis Corp.*, 429 F.3d 592, 600 (6th Cir. 2005) (citing *Hickory Specialties, Inc. v. B & L Lab., Inc.*, 592

6

Case 3:06-cv-00170   Document 42   Filed 08/15/06   Page 6 of 20   PageID #: 13

S.W.2d 583, 586 (Tenn. Ct. App. 1979)); *Hauck Mfg. Co. v. Astec Indus., Inc.*, 376 F. Supp. 2d 808, 816-17 (E.D. Tenn. 2005).[1]

---

[1]As an initial matter, plaintiff argues that the statute wholly preempts the common law of trade secrets in Tennessee. *See* Doc. 33 at 8. In support of its position, plaintiff points to *Vincit Enter., Inc. v. Zimmerman*, No. 1:06-CV-57, 2006 WL 1319515 (E.D. Tenn. May 12, 2006), and *Hauck Mfg. Co. v. Astec Indus., Inc.*, 376 F. Supp. 2d 808 (E.D. Tenn. 2005), two cases involving application of the law of trade secrets. Both cases, however, are consistent in stating TUTSA, by its own terms, preempts conflicting common law remedies and conflicting common law causes of action for misappropriation of trade secrets. *See Zimmerman*, 2006 WL 1319515, at *7 (citing Tenn. Code Ann. § 47-25-1708; *Hauck Mfg.*, 375 F. Supp. 2d at 654, 658). Neither case holds that TUTSA preempted or otherwise abrogated the entire body of trade secrets common law in Tennessee.

As TUTSA itself sets forth in a subsection entitled "Conflicting Remedies":
(a) Except as provided in subsection (b), this part displaces *conflicting* tort, restitutionary, and other law of this state providing civil *remedies* for misappropriation of a trade secret.
(b) This part does not affect:
   (1) Contractual remedies, whether or not based upon misappropriation of a trade secret; provided, a contractual duty to maintain secrecy or limit use of a trade secret shall not be deemed to be void or unenforceable solely for lack of durational or geographical limitation on the duty;
   (2) Other civil remedies that are not based upon misappropriation of a trade secret; or
   (3) Criminal remedies, whether or not based upon misappropriation of a trade secret.
(c) In no event shall a written contract be required to maintain an action or recover damages for misappropriation of a trade secret proven under this part.

Tenn. Code Ann. § 47-25-1708 (emphasis added). Thus, by its own language, TUTSA preempts only conflicting common law, but does not displace that common law which complements or co-exists with the statute.

The conclusion that TUTSA preempts only conflicting common law is strengthened by a survey of Tennessee cases that have been decided since passage of TUTSA. For example, in *Wright Med. Tech., Inc. v. Grisoni*, 135 S.W.3d 561 (Tenn. Ct. App. 2001), decided after TUTSA went into effect, the Tennessee Court of Appeals discussed some factors courts use to determine whether certain information is a trade secret and cited *Venture Express, Inc. v. Zilly*, 973 S.W.2d 602 (Tenn. Ct. App. 1998), a pre-TUTSA case. *See Grisoni*, 135 S.W.3d at 589 (citing *Zilly*, 973 S.W.2d at 606). In another example, in *B & L Corp. v. Thomas & Thorngren, Inc.*, 162 S.W.3d 189 (Tenn. Ct. App. 2004), the Tennessee Court of Appeals discussed certain information that, absent contrary evidence, was not a trade secret and again cited *Zilly*. *See B & L Corp.*, 162 S.W.3d at 215 (quoting *Zilly*, 973 S.W.2d at 606). Thus, at the very least, these two examples indicate that reliance on *Zilly* does not conflict with TUTSA and, more broadly, passage of TUTSA did not preempt the whole of trade secrets common law in Tennessee. Instead, by its terms and as explained in *Zimmerman* and *Hauck Mfg.*, TUTSA preempts contradictory common law causes of action and remedies for misappropriation of trade secrets.

7

Under TUTSA, "trade secret" means:

> information, without regard to form, including, but not limited to, technical, nontechnical or financial data, a formula, pattern, compilation, program, device, method, technique, process, or plan that:
> (A) Derives independent economic value, actual or potential, from not being generally known to, and not being readily accessible by proper means by other persons who can obtain economic value from its disclosure or use; and
> (B) Is the subject of efforts that are reasonable under the circumstances to maintain its secrecy.

Tenn.Code Ann. § 47-25-1702(4). Some factors to be considered in determining whether certain information is a trade secret are as follows:

> (1) the extent to which the information is known outside of the business; (2) the extent to which it is known by employees and others involved in the business; (3) the extent of measures taken by the business to guard the secrecy of the information; (4) the value of the information to the business and to its competitors; (5) the amount of money or effort expended by the business in developing the information; and (6) the ease or difficulty with which the information could be properly acquired or duplicated by others.

*Wright Med. Tech., Inc. v. Grisoni*, 135 S.W.3d 561, 589 (Tenn. Ct. App. 2001) (citing *Venture Express, Inc. v. Zilly*, 973 S.W.2d 602, 606 (Tenn. Ct. App. 1998)). Having said that, Tennessee courts have held that, absent evidence to the contrary, these types of information are not confidential: (1) remembered information as to a business's prices; (2) specific needs and business habits of certain customers; and (3) an employee's personality and relationships that he has established with certain customers. *B & L Corp. v. Thomas & Thorngren, Inc.*, 162 S.W.3d 189, 215 (Tenn. Ct. App. 2004) (citations omitted).

In the instant case, plaintiff identifies "the information at issue" as including "the names, contact information and specific organizational, sales and recruiting details about the

8

salesforce." Doc. 9 at 2-3. Plaintiff argues that the information was developed at great expense and is of significant value to competitors because of the nature of the direct sales business. *Id*. at 11-12. Furthermore, plaintiff explains that this information was protected by computer encryption, passwords, "CONFIDENTIAL" stamps, and the salesforce was compartmentalized so that mid-level salespeople only had information about their own lower-level salespeople. *See* id. at 11.

Defendants respond that the names and contact information of plaintiff's salesforce are not trade secrets because they have been publicly disclosed and are available through proper means to any competitor. *See* Doc. 24 at 9. Defendants explain that plaintiff goes to a great deal of trouble to publicize members of its salesforce through business cards, literature, and webpages. *Id*. at 11. In addition, defendants point out that compilations of that information can be found in plaintiff's *Reflections* magazine, which is distributed to plaintiff's salesforce and is available to the public for purchase on eBay. *Id*.

Plaintiff replies that defendants' characterization of the information at issue here understates its value because "the information . . . is far more comprehensive than a simple customer list . . . ." Doc. 33 at 2. Plaintiff contends that the trade secret is the *compilation* of information, including names, contact information, sales activity, and organizational details. *Id*. (emphasis added). While defendants have shown that certain sales information can be obtained publicly, plaintiff contends that the trade secrets allegedly used by defendant Watkins is the compilation or totality of that data. Thus, as the Court understands it, plaintiff's contention is that, while any *particular* salesperson's name, contact information,

9

and performance might be obtainable by competitors or the public, the *compilation* of that data to include a large number of salespeople into the kind of list plaintiff has developed constitutes a trade secret based on its value and the efforts plaintiff took to keep it a secret. In a sense, plaintiff is arguing that the whole of plaintiff's salesforce information is worth more than the sum of its parts.

Plaintiff's argument, however, is disconnected from the scope of information defendant Watkins actually used. While plaintiff argues that its compilation of salesforce information is a trade secret, the evidence, at least at this stage of the proceeding, is that defendant Watkins recruited salespeople "[she] knew personally and/or those who contacted [her] or SCO consultants . . . ." Doc. 27 at 2. Thus, the issue is whether the information defendant Watkins actually used is a trade secret because that is the information at issue in this case.

Viewed in light of the information defendant Watkins actually used, it becomes clear that the personal knowledge of particular salespeople is not a trade secret. First, knowledge of particular salespeople derives only marginal independent value from not being generally known since, as plaintiff argues, it is the compilation of this information that is so valuable. Second, plaintiff, quite understandably, does not make any effort to keep the identities of its salespeople a secret since that would interfere with its ability to solicit customers. As defendant has illustrated, while a complete list containing the identities of plaintiff's salespeople might not be readily accessible by proper means, one can readily access the

identities, status, and locations of specific salespeople through plaintiff's promotional activities, literature, and website, in addition to other open sources.

The *Grisoni* factors also tilt against viewing the personal knowledge of particular salespeople associated with a competitor as trade secrets because such information is so widely available, even though, in the unique context of the direct sales industry, such information might have value. First, personal knowledge of plaintiff's salespeople is widely known outside and within the business. Second, while plaintiff takes measures to protect certain information about those salespeople, it does not protect their individual identities, titles, or contact information. Third, having said that, information about a firm's salesforce is uniquely valuable in the direct sales industry, and plaintiff has expended significant resources compiling its information, but the value of personal knowledge of the identities, titles, contact information, and personal information about certain salespeople is relatively low by comparison. Finally, as defendants have shown, one can obtain personal knowledge of plaintiff's salespeople with relative ease by obtaining copies of plaintiff's promotional materials through open sources.

Having said that, it is important to point out that this action remains in its early stages. Defendant Watkins's declaration does not identify the specific salespeople she recruited, and neither party has provided much detail about what specific information she used or how she obtained it. As discovery proceeds, plaintiff's arguments about the compilation of salesforce information may require a new examination, but at the moment, the Court must conclude that the information defendant Watkins declares she actually used, which was personal

11

knowledge of identities, traits, titles, and contact information, did not constitute trade secrets because it was information that derived only marginal value from not being generally known and was not maintained as a secret.

Turning to the second element in the misappropriation of trade secrets analysis, "misappropriation" means:

> (A) Acquisition of a trade secret of another by a person who knows or has reason to know that the trade secret was acquired by improper means; or
> (B) Disclosure or use of a trade secret of another without express or implied consent by a person who:
> > (i) Used improper means to acquire knowledge of the trade secret; or
> > (ii) At the time of disclosure or use, knew or had reason to know that that person's knowledge of the trade secret was:
> > > (a) Derived from or through a person who had utilized improper means to acquire it;
> > > (b) Acquired under circumstances giving rise to a duty to maintain its secrecy or limit its use; or
> > > (c) Derived from or through a person who owed a duty to the person seeking relief to maintain its secrecy or limit its use; or
> > (iii) Before a material change of his or her position, knew or had reason to know that it was a trade secret and that knowledge of it had been acquired by accident or mistake[.]

Tenn. Code Ann. § 47-25-1702(2). The term "improper means" is defined as including "theft, bribery, misrepresentation, breach or inducement of a breach of a duty to maintain secrecy or limit use, or espionage through electronic or other means." *Id*. at § 1702(1).

In light of the Court's discussion of the trade secrets element, the misappropriation element is also likely to fail since it requires the acquisition or disclosure of a trade secret. Nevertheless, assuming *arguendo* that defendant Watkins's personal knowledge of certain

12

Case 3:06-cv-00170 Document 42 Filed 08/15/06 Page 12 of 20 PageID #: 19

knowledge of identities, traits, titles, and contact information, did not constitute trade secrets because it was information that derived only marginal value from not being generally known and was not maintained as a secret.

Turning to the second element in the misappropriation of trade secrets analysis, "misappropriation" means:

> (A) Acquisition of a trade secret of another by a person who knows or has reason to know that the trade secret was acquired by improper means; or
> (B) Disclosure or use of a trade secret of another without express or implied consent by a person who:
> > (i) Used improper means to acquire knowledge of the trade secret; or
> > (ii) At the time of disclosure or use, knew or had reason to know that that person's knowledge of the trade secret was:
> > > (a) Derived from or through a person who had utilized improper means to acquire it;
> > > (b) Acquired under circumstances giving rise to a duty to maintain its secrecy or limit its use; or
> > > (c) Derived from or through a person who owed a duty to the person seeking relief to maintain its secrecy or limit its use; or
> > (iii) Before a material change of his or her position, knew or had reason to know that it was a trade secret and that knowledge of it had been acquired by accident or mistake[.]

Tenn. Code Ann. § 47-25-1702(2). The term "improper means" is defined as including "theft, bribery, misrepresentation, breach or inducement of a breach of a duty to maintain secrecy or limit use, or espionage through electronic or other means." *Id*. at § 1702(1).

In light of the Court's discussion of the trade secrets element, the misappropriation element is also likely to fail since it requires the acquisition or disclosure of a trade secret. Nevertheless, assuming *arguendo* that defendant Watkins's personal knowledge of certain

PartyLite salespeople was a trade secret, the Court will consider whether she misappropriated it.

While there is little or no evidence explaining the precise means defendant Watkins used to obtain her personal knowledge of certain salespeople associated with plaintiff, one can safely assume that it was obtained during her employment with plaintiff. In addition, as the declaration of Mr. Mannion emphasizes, plaintiff's code of conduct imposed obligations upon its employees not to publicly disclose confidential information, not to use confidential information for personal benefit, and not to disclose plaintiff information to another direct sales firm. *See* Doc. 8-2 at 4-8. Assuming the information used by defendant Watkins was a confidential, she probably obtained it and made use of it by breaching her obligations to plaintiff.

Nevertheless, at this early stage of the proceeding, plaintiff has established a very low likelihood of success on the merits of its misappropriation of trade secrets claim because it has not shown that defendant Watkins's personal knowledge of certain PartyLite salespeople was a trade secret.

ii. *Tortious Interference and Inducement to Breach of Contract*

"In Tennessee, the common law action for tortious interference with business relations and the statutory action for unlawful procurement of breach of contract,[] have the same elements and operate as alternative theories of recovery." *Hauck Mfg.*, 376 F. Supp. 2d at 814. (citing Tenn. Code Ann. § 47-50-109; *Buddy Lee Attractions, Inc. v. William Morris Agency, Inc.*, 13 S.W.3d 343, 359 (Tenn. Ct. App.1999)). In order to recover on either cause

13

of action, a plaintiff is required to prove by a preponderance of the evidence (1) the existence of a contract or prospective business relationship; (2) the defendant's knowledge of that agreement or relationship; (3) defendant's intent to induce a breach of the agreement or termination of the relationship; (4) defendant acted maliciously, with improper motive or improper means; (5) the agreement was in fact breached or the relationship was terminated; (6) defendant's conduct was the proximate cause of the breach or termination; and (7) plaintiff suffered damages resulting from the breach or termination. *Hauck Mfg.*, 376 F. Supp. 2d at 814 (citing *Quality Auto Parts Co., Inc.* v. *Bluff City Buick Co.*, 876 S.W.2d 818, 822 (Tenn.1994); *Buddy Lee Attractions Inc.*, 13 S.W.3d at 359). *See also* Tenn. Code Ann. § 47-50-109; *AmeriGas Propane, Inc. v. J.T. Crook*, 844 F. Supp. 379, 388 (M.D. Tenn. 1993) (citation omitted); *Trau-Med of Am., Inc. v. Allstate Ins. Co.*, 71 S.W.3d 691, 701-02 (Tenn. 2002) (recognizing tort of intentional interference with business relationships) (citations and footnotes omitted). The malice, improper motive or improper means element includes the "misuse of inside or confidential information or breach of a fiduciary relationship," in addition to "misrepresentation or deceit, defamation, duress, [and] undue influence." *Trau-Med*, 71 S.W.3d at 701, n.5. To show malice, a party need only show conduct "that is 'the willful violation of a known right.'" *AmeriGas Propane*, 844 F. Supp. at 388 (citation omitted).

In this action, plaintiff alleges that defendant Watkins "interfered by the improper means of misappropriation of trade secret information, means of unfair competition and by breaching her contract and fiduciary duty." Doc. 1 at 20. Plaintiff also alleges defendants

14

induced plaintiff's salespeople to breach their contracts and fiduciary duties by misappropriating trade secrets. Thus, it is clear that plaintiff's tortious interference and inducement to breach of contract claims are rooted in the alleged misappropriation of trade secrets. TUTSA, however, preempted other causes of action rooted in misappropriation of trade secrets. *Vincit Enter., Inc. v. Zimmerman*, No. 1:06-CV-57, 2006 WL 1319515 at *7 (E.D. Tenn. May 12, 2006). Accordingly, to the extent these causes of action are preempted by TUTSA, plaintiff has no likelihood of success on the merits of its claims for tortious interference and inducement to breach of contract.

        iii.     *Breach of Contract and Breach of Fiduciary Duty*

In Tennessee, the elements of a breach of contract are: "(1) the existence of an enforceable contract, (2) nonperformance amounting to a breach of the contract, and (3) damages caused by the breach of the contract." *ARC Life-Med, Inc. v. AMC-Tenn., Inc.*, 183 S.W.3d 1, 26 (Tenn. Ct. App. 2005) quoting *Custom Built Homes v. G.S. Hinsen Co., Inc.*, No. 01A01-9511-CV-00513, 1998 WL 960287 (Tenn. Ct. App. Feb. 2, 1998). *See also Life Care Ctrs. of Am., Inc. v. Charles Town Assoc's. Ltd. P'ship, LPIMC, Inc.*, 79 F.3d 496, 514 (6th Cir. 1996). "During the employment relationship, an employee has a fiduciary duty of loyalty to the employer. The employee must act solely for the benefit of the employer in matters within the scope of his employment. The employee must not engage in conduct that is adverse to the employer's interests." *Knott's Wholesale Foods, Inc. v. Azbell*, No. 01A-01-9510-CH-00459, 1996 WL 697943 at *3 (Tenn. Ct. App. Dec. 6, 1996) (citing 27 Am. Jur. 2d Employment Relationship § 216).

15

> After the termination of his agency, in the absence of a restrictive agreement, the agent can properly compete with his principal as to matters for which he has been employed. . . . Even before the termination of the agency, he is entitled to make arrangements to compete, except that he cannot properly use confidential information peculiar to his employer's business and acquired therein. Thus, before the end of his employment, he can properly purchase a rival business and upon termination of employment immediately compete. He is not, however, entitled to solicit customers for such rival business before the end of his employment nor can he properly do other similar acts in direct competition with the employer's business.

Restatement (Second) of Agency § 393, cmt. e, *quoted in Knott's Wholesale Foods*, 1996 WL 697943 at *4.

In this action, plaintiff alleges defendant Watkins breached her contract and fiduciary duty by misusing, taking, and disclosing "information with respect to the PartyLite salesforce." Doc. 1 at 19. As has already been discussed, however, TUTSA preempted other causes of action rooted in misappropriation of trade secrets. *Vincit Zimmerman*, 2006 WL 1319515 at *7. Thus, to the extent plaintiff's claims for breach of contract and fiduciary duty are preempted by TUTSA, plaintiff has no likelihood of success on the merits of these claims.

    iv.    *Unfair Competition*

Unfair competition is a broad term encompassing "several related torts involving improper interference with business prospects. Although unfair competition does not stem from a breach of a fiduciary relationship, the breach of a fiduciary relationship by an employee, using confidential information obtained while employed to the detriment of his

16

employer, may constitute unfair competition." *B & L Corp. v. Thomas & Thorngren, Inc.*, 917 S.W.2d 674, 681 (Tenn. Ct. App. 1995) (citation omitted).

Plaintiff alleges defendants engaged in unfair competition by "misappropriation of trade secrets, illegal interference, and breaches of fiduciary duty and contract outlined above, but also their use of other unfair devices, in particular[,] the so-called Bridge Agreement." Doc. 9 at 21. Thus, one part of plaintiff's unfair competition claim is rooted in the misappropriation of trade secrets, but TUTSA preempted other causes of action rooted in misappropriation of trade secrets. *Vincit Zimmerman*, 2006 WL 1319515 at \*7. Therefore, to the extent plaintiff's unfair competition claim is rooted in the alleged misappropriation of trade secrets, it has no likelihood of success on the merits because such claims are preempted.

The other part of plaintiff's unfair competition claim is rooted in the use of the Bridge Agreement, which plaintiff alleges is a kind of predatory pricing because it "grants advanced status based on PartyLite rank, but also because it pays compensation in excess of that which is justified by a salesperson's actual sales results." Doc. 8 at 21 (citations omitted). Defendants deny that its Bridge Agreement targets plaintiff or that it pays unjustifiably excess compensation pursuant to the Agreement. *See* Doc. 24 at 21-23. Plaintiff has presented no legal authority in support of its assertion that the Bridge Agreement, or similar agreements, constitute predatory pricing. In the absence of such authority, the Court must conclude that plaintiff has a low likelihood of success on the merits of this portion of plaintiff's unfair competition claim.

17

B. <u>Other Preliminary Injunction Factors</u>

Because plaintiff has shown a low likelihood of success on the merits of its claims and that showing varies inversely with the other three factors, *see DeLorean*, 755 F.2d at 1229, plaintiff must make a more favorable showing of the irreparable harm, harm to others, and public interest factors. *See Performance Unlimited*, 52 F.3d at 1386. *See Total Car Franchising Corp.*, 981 F. Supp. at 1081. With that in mind, the Court next turns to the three remaining preliminary injunction factors.

i. *Irreparable Harm*

"A plaintiff's harm is irreparable harm if monetary damages cannot be calculated with a reasonable degree of certainty or will not adequately compensate the injured party. The loss of customer goodwill and injuries that are a consequence of unfair competition are difficult to compute and can constitute irreparable harm." *AmeriGas Propane*, 844 F. Supp. at 390 (citing *Basicomputer Corp. v. Scott*, 973 F.2d 507, 511-12 (6th Cir. 1992) (internal citations omitted). Where confidential information would be "extremely useful to competitors" disclosure of that information may constitute irreparable harm. *Honda Research & Dev. Co., Ltd. v. Loveall*, 687 F. Supp. 355, 356-57 (E.D. Tenn. 1985) (concluding irreparable harm results from public disclosure of trade secrets contained in document filed with Register of Copyrights under "secure tests" filing procedure).

Assuming *arguendo* the information used by defendant Watkins was a trade secret, plaintiff has probably shown some degree of irreparable harm with respect to its misappropriation of trade secrets claim. Plaintiff's other claims, to the extent they are not

18

rooted in the alleged misappropriation of trade secrets, are compensable through legal remedies. Accordingly, plaintiff has shown a modest degree of irreparable harm overall, but irreparable harm nonetheless.

    ii.    *Harm to Others*

The third factor the Court must consider is whether imposition of the requested injunction will cause "substantial harm" to others. To do this, the Court must "balance the harm a plaintiff would suffer if its request for a preliminary injunction was denied with the harm the defendants would suffer if they were to be preliminarily enjoined. It also requires a court to assess the impact a preliminary injunction might have on relevant third parties." *Corporate Express Office Prods*, 2002 WL 1901902 at *27 (quoting *Leary*, 228 F.3d at 736).

If a preliminary injunction is not granted, plaintiff argues that its salesforce will be harmed because defendants' ongoing recruitment efforts will negatively impact their incomes. *See* Doc. 9 at 23. On the other hand, defendants argue that their interests would be harmed because they would be prohibited from entering into employment or other business relationships with people formerly associated with plaintiff. In balancing these competing interests, the Court concludes that the greater harm is the restraint on competition for the services of those salespeople who are independent contractors. Thus, the greater harm would result from the imposition of a preliminary injunction.

    iii.    *Public Interest*

"Tennessee has a strong public policy in favor of upholding contracts." *AmeriGas Propane*, 844 F. Supp. at 390 (citing Tenn. Code Ann. § 47-50-112(a) (1992); *St. Paul*

*Surplus Lines Ins. Co. v. Bishops Gate Ins. Co.*, 725 S.W.2d 948, 951 (Tenn. Ct. App. 1986); *Ballard v. North Am. Life & Cas.*, 667 S.W.2d 79, 82 (Tenn. Ct. App. 1983)). On the other hand, restraints of trade are disfavored. *See Vantage Tech., LLC v. Cross*, 17 S.W.3d 637, 644 (Tenn. 2000). As these competing principles indicate, different aspects of the public interest are served by either granting or denying the requested injunction. Tennessee's strong public interest favoring upholding contracts may still be protected in this case without the imposition of a preliminary injunction, but as discussed with regard to the harm to others factor, imposing a preliminary injunction would act as a restraint of trade. For that reason, the public interest does not favor the requested relief.

### III.   Conclusion

Having weighed all of the preliminary injunction factors, the Court concludes that a preliminary injunction should not be imposed in this case. While plaintiff has shown a low likelihood of success on the merits and a modest degree of irreparable harm, the risk of harm to others and the public interest factors weigh against granting the requested injunction. Therefore, for the reasons already discussed, plaintiff's motion will be denied.

ORDER ACCORDINGLY.

<pre>                                        s/ Thomas A. Varlan
                                        UNITED STATES DISTRICT JUDGE</pre>